UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

MY CLASSIFIED ADS, L.L.C.,

       Plaintiff,

v.                                    Case No. 8:14-cv-2365-T-33AEP

GREG WELTEROTH HOLDING INC.
d/b/a GREGORY WELTEROTH
ADVERTISING,

       Defendant.

_____/

**ORDER**

This cause is before the Court pursuant to Plaintiff My Classified Ads, L.L.C.'s ("MCA") Motion to Dismiss Counts II – VI of Defendant's Amended Counterclaim, which was filed on January 20, 2015. (Doc. # 31). Defendant Greg Welteroth Holding, Inc. d/b/a Gregory Welteroth Advertising ("GWA") filed a response in opposition to the Motion on February 13, 2015. (Doc. # 37). For the reasons stated below, the Court denies MCA's Motion.

**I. Background**

MCA initiated this action on July 25, 2014, in state court. (Doc. # 2). On September 17, 2014, GWA removed this action on the basis of diversity jurisdiction pursuant to 28

U.S.C. § 1332. (Doc. # 1). Thereafter, on October 10, 2014, MCA filed its Amended Complaint. (Doc. # 14).

Subsequently, GWA filed a Motion to Dismiss the Amended Complaint on October 23, 2014 (Doc. # 17), which was denied by this Court on November 10, 2014 (Doc. # 23). As a result, GWA filed its Answer, Affirmative Defenses, and Counterclaim on November 24, 2014 (see Doc. # 24), and its Amended Counterclaim on January 2, 2015 (Doc. # 29).

According to the Amended Counterclaim, "[b]eginning in approximately June of 2010, GWA developed a professional relationship with [Blaire] Fanning and MCA, pursuant to which MCA procured certain radio spots and/or other advertising mediums for GWA." (Id. at 10). In October of 2013, GWA and MCA "engaged in preliminary discussions pertaining to [a new radio advertising] opportunity." (Id.). During these discussions, MCA represented that MCA "either possessed in its existing inventory all of the desired radio spots selected by GWA or that MCA was already positioned to readily procure any and all desired radio spots selected by GWA." (Id.).

On November 14, 2013, GWA submitted a media plan to MCA "that contained parameters and specifications to procure millions of dollars' worth of regional and local radio advertising spots throughout the United States" (referred to

by GWA as the "SOW"). (Id. at 11-12). The SOW set forth that MCA would provide certain radio spots at designated times, on radio stations meeting specific demographic requirements, for designated prices for advertising purposes. (Id. at 11-13). GWA advised MCA that "the budget(s) for each radio market (both local and national) were not finalized and may be amended." (Id. at 12). MCA accepted the terms proposed by GWA, and specifically acknowledged and agreed that GWA may make all such amendments. (Id.).

Between February 27, 2014, and May 21, 2014, GWA paid $1,170,984.59 to MCA to purchase the media identified in the SOW. (Id.). GWA then issued a final payment of $155,910.90 on July 14, 2014. (Id.). According to GWA, it was agreed upon by GWA and MCA that "these payments were to be paid to the radio stations for inventory not owned by MCA and/or represent the actual cost of the radio spots already purchased by MCA, plus an eight percent (8%) commission." (Id.).

The SOW, after all modifications ("the Program"), launched in March of 2014. (Id. at 13). Shortly thereafter, GWA received information that MCA was not meeting the agreed upon terms of the Program. (Id. at 14). "Specifically, significant percentages of radio spots were not being run during prime time hours, on radio stations with formats other

than the agreed upon formats." (Id.). GWA posits that MCA instead "attempted to conceal its own deficiencies, and misrepresented the status of the Program by repeatedly, and falsely, reassuring GWA that the requirements set forth in the Program were either met or being met." (Id.).

On May 6, 2014, MCA disclosed to GWA that the radio spots were not being run during the prime time hours, nor were they on the selected radio stations. (Id.). MCA acknowledged the mistake and agreed to ensure that the proper radio spots would be purchased and run from that date forward in line with the Program. (Id.). In June of 2014, GWA learned that "the majority of the radio spots procured by MCA after the May 6, 2014, conversation . . . were, in actuality, non-conforming media that failed to meet GWA's requirements or comport to the Program." (Id.). On June 18, 2014, MCA admitted to the Program's continued deficiencies and confirmed that it was responsible for such deficiencies. (Id. at 15). However, MCA attempted to re-assure GWA that these deficiencies would be corrected immediately. (Id.).

According to GWA, MCA failed to cure these performance deficiencies and failed to meet the requirements as set forth by the Program. (Id.). Furthermore, GWA submits that MCA "failed to use the monies advanced by GWA to procure

advertising spots as promised, and that MCA instead wrongfully retained some or all of these monies for their own benefit and use." (Id. at 16). Due to MCA's failure to perform as agreed, GWA procured radio spots itself as well as other substitute vendors at a "substantial cost" to GWA. (Id.). In addition, GWA contends that it became exposed to potential claims and sustained business interruption losses in excess of $500,000. (Id. at 16-17).

The Amended Counterclaim sets forth the following allegations against MCA: (1) Breach of Contract, (2) Unjust Enrichment, (3) Misrepresentation, (4) Fraud, (5) Conversion, and (6) Breach of Fiduciary Duty. (See Doc. # 29). MCA filed the present Motion on January 20, 2015, seeking dismissal of Counts II – VI of the Amended Counterclaim. (Doc. # 31). GWA filed a response in opposition thereto on February 13, 2015. (Doc. # 37). This Court has reviewed the Motion and the response and is otherwise fully advised in the premises.

## II. Legal Standard

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, this Court accepts as true all the allegations in the counterclaim and construes them in the light most favorable to the counterclaim plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004).

Further, this Court favors the counterclaim plaintiff with all reasonable inferences from the allegations in the counterclaim.   Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true."). However:

> While a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

## III. Analysis

According to MCA, this Court should dismiss Counts II-VI of GWA's Amended Counterclaim because "GWA improperly asserts various equitable, tort and legal claims, each and every one of which is insufficiently pled and their maintenance is precluded by applicable law." (Doc. # 31 at 1). The Court will address Counts II-VI in turn.

### A. Count II - Unjust Enrichment

MCA argues that GWA's claim for unjust enrichment should be dismissed because "under Florida law, an unjust enrichment count must fail upon the showing of an express contract." (Id. at 4). To the extent that GWA seeks to assert its unjust enrichment claim in the alternative, MCA argues that "an unjust enrichment claim may only be pled in the alternative where one of the parties asserts that the contract governing the dispute is invalid." (Id. at 5). However, MCA argues that "[h]ere, there is no dispute that a contract exists and is a valid and enforceable contract." (Id.).

Upon review, the Court finds that although GWA argues that the parties entered into a "valid, binding, and enforceable" contract (Doc. # 29 at 17), the parties dispute the terms of the relevant contract. Specifically, MCA has previously disputed the contract and MCA may continue to dispute the contract.  In addition, the contracts referenced in the Amended Complaint and Amended Counterclaim are oral contracts and the parties have alleged substantially different terms. Therefore, for purposes of the present analysis, the Court finds that GWA may plead its equitable claim of unjust enrichment in the alternative to its breach of contract claim. See e.g. Shibata v. Lim, 133 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000) ("Both the Federal Rules of Civil

Procedure and Florida law permit a party to allege, in the alternative, recovery under an express contract and seek equitable relief under the theory of unjust enrichment."). Accordingly, the Court will analyze the sufficiency of GWA's unjust enrichment claim.

To state a claim for unjust enrichment, a plaintiff must allege, "(1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit, (2) the defendant voluntarily accepted and retained the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it." Leedom Mgmt. Grp., Inc. v. Perlmutter, No. 8:11-cv-2108-T-33TBM, 2012 WL 1883765, at *4 (M.D. Fla. May 22, 2012).

Here, GWA alleged that it paid MCA "$1,364,895.00 with the understanding and belief, based on MCA's representations that MCA would procure the radio advertising spots in conformity with the established parameters and specifications of the Program." (Doc. # 29 at 19). Further, GWA provided that MCA "accepted, benefited from, enjoyed and retained the aforesaid funds." (Id.). Moreover, GWA submitted that MCA failed to provide the radio advertising spots as promised and retained at least $508,141.37 for its own use and benefit. (Id.). Thus, "[i]t would be unjust and unreasonable to allow

MCA to retain the benefit of the . . . funds without returning the same to GWA." (Id.). As GWA has sufficiently alleged the elements of its unjust enrichment claim, in the alternative to its breach of contract claim, MCA's Motion to dismiss Count II is denied.

### B. Count III - Misrepresentation

To state a claim for negligent misrepresentation, a party must allege: (1) a misrepresentation of a material fact, (2) the representor made the representation without knowledge of its truth or falsity or the representor should have known of its falsity, (3) the representor intended that the representation would induce reliance, and (4) injury resulting from justifiable reliance. Mass. Mut. Life Ins. Co. v. Switlyk, No. 8:13-cv-3243-T-33MAP, 2014 WL 3894342, at *5 (M.D. Fla. Aug. 8, 2014).

Additionally, a pleading that contains an allegation of misrepresentation or fraud is subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). See Linville v. Ginn Real Estate Co., LLC, 697 F. Supp. 2d 1302, 1306 (M.D. Fla. 2010)("Rule 9(b) applies to claims for negligent misrepresentation under Florida law because negligent misrepresentation sounds in fraud.")(internal quotation omitted). Rule 9(b) provides that, "[i]n alleging fraud or

mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." <u>See</u> Fed. R. Civ. P. 9(b). To pass muster under Rule 9(b), a complaint must specify:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each statement and the person responsible for making . . . them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

<u>FindWhat Investor Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1296 (11th Cir. 2011). The Court must "be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading." <u>Friedlander v. Nims</u>, 755 F.2d 810, 813 n. 3 (11th Cir. 1985).

Upon review, the Court finds that GWA has satisfied the pleading requirements of Rule 9(b). GWA has alleged the relevant oral representations and omissions that were made. Specifically, GWA contends that MCA, whose only member is Fanning, falsely "represented that it already possessed or that it had immediate access to" conforming radio advertising spots. (Doc. # 29 at 9, 20). Furthermore, MCA represented that it would charge a commission of 8% and, on June 18, 2014,

at GWA's offices in Pennsylvania, MCA – through Fanning - falsely represented that GWA had charged only 8% commission. (Id. at 11, 20). GWA also alleges that MCA made these representations during the course of negotiations from October of 2013, through November of 2013 (Id. at 10-11), and then during the negotiations between November of 2013, and February of 2014. (Id. at 12).

In addition, GWA submits that "[a] present misrepresentation concerning a future intent may form the basis for actionable fraud where the party making the misrepresentation is aware at the time that it is in fact false." (Doc. # 37 at 7)(quoting Bongard v. Winter, 516 So. 2d 27 (Fla. 3d DCA 1987)). According to GWA, the relevant misrepresentations were made falsely or with reckless disregard to their truth or falsity and with the intent of inducing reliance. (Id. at 20). The misrepresentations induced reliance, because GWA submits that it would not have entered into the agreement with MCA or continued the business relationship without the misrepresentations. (Id.). Finally, GWA has alleged that it suffered substantial losses as a result of its reliance on MCA's misrepresentations. (Id.).

In regards to MCA's argument that GWA's misrepresentation claim cannot be pursued if the damages are

duplicative of a contract claim, GWA contends that such argument is based on the "economic loss rule." (Doc. # 37 at 7). In <u>Medalie v. FSC Securities Corporation</u>, 87 F. Supp. 2d 1295 (S.D. Fla. 2000), the court provided a general introduction to Florida's economic loss rule. As explained in that decision:

> The doctrine provides that contract principles are more appropriate than tort principles for resolving economic loss claims without accompanying physical injury or injury to property other than that which is the subject of the contract. Consequently, a party to a contract may not pursue a claim in tort for solely economic losses unless the party breaching the contract has committed a tort which is distinguishable from or independent of the breach of contract.

<u>Id.</u> at 1299-00 (internal citations omitted). However, the Florida Supreme Court has determined that the economic loss rule applies only in products liability cases. <u>See</u> <u>Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.</u>, 110 S. 3d 399, 401 (Fla. 2013)("Although the economic loss rule has been used in both the products liability context and in cases where the parties were in contractual privity, the Florida Supreme Court recently declared 'the economic loss rule applies only in the products liability context.'"). Thus, as this is not

a products liability action, the economic loss rule is inapplicable to the case at hand.

Nevertheless, the Court finds that GWA's claim for misrepresentation is a separate and distinct claim from the breach of contract claim as it requires proof of separate and distinct facts. Specifically, the misrepresentation claim is based on statements that induced GWA to enter into the oral contract, while the breach of contract claim is based on the failure to perform the contract. Thus, taking the factual allegations in the light most favorable to GWA, the Court finds that GWA has sufficiently alleged its misrepresentation claim. Therefore, MCA's Motion to dismiss Count III is denied.

### C. Count IV – Fraud

To state a claim for fraud under Florida law, a party must demonstrate:

> (1) [A] false statement of fact, (2) known by a person making the statement to be false at the time it was made, (3) made for the purpose of inducing another to act in reliance thereon, (4) action by the other person in reliance on the correctness of the statement, and (5) resulting damage to the other person.

State Farm Mut. Auto. Ins. Co. v. Physicians Grp. of Sarasota, LLC, 9 F. Supp. 3d 1303, 1311 (M.D. Fla. 2014). Additionally, a pleading that contains an allegation of fraud is subject to the heightened pleading standard of Rule 9(b).

MCA suggests that GWA's claim of fraud should be dismissed because "it fails to state a cause of action for fraud and fails to allege facts sufficient to meet the requisite pleading standard under 9(b)." (Doc. # 31 at 10-11). Specifically, MCA argues that the statements contained in the Amended Counterclaim fail to "allege the place where the statements were made," and fail to "allege what MCA actually obtained as a result of these statements." (Id. at 11). Furthermore, MCA contends that GWA "fails to plead elements two through four of the fraud claim with any particularity, but instead merely recites these fraud elements with conclusory statements," which does not rise to the plausibility standard or the particularity standard required by Rule 9(b). (Id.).

In addition, MCA posits that GWA's damages claim under Count IV is again "vague and duplicates the damages recoverable under Count I for breach of contract." (Id. at 12)(citing Reyes v. State, 655 So. 2d 111 (Fla. 2d DCA 1995)("A fraud claim may not be pursued if its damages merely duplicate the damages recoverable for breach of a related contract.")). Here, however, MCA argues that the alleged false statements that form the basis for fraud are statements regarding future performance under the terms of the contract,

14

and therefore, the purported false statements are insufficient as a matter of law to support GWA's fraud claim. (Id.).

Upon review of the Amended Counterclaim, the Court finds that GWA has sufficiently alleged its fraud claim to withstand MCA's Motion. GWA alleges that on June 18, 2014, "MCA, through Blaire Fanning, stated that MCA's performance deficiencies would be corrected immediately and that the media delineated in the Program would run as specified, that 'make goods' would be issued and that only nominal costs would be incurred by GWA." (Doc. # 29 at 21). GWA further contends that "MCA represented that future radio spots would be aired during prime time hours on conforming radio stations and that additional conforming radio advertisements would be run to 'make good' or make up for the past admittedly non-conforming radio advertisements, MCA agreed to provide 50,000, sixty-second radio spots in appropriate markets to make good for the prior deficiencies." (Id.).

GWA also alleges that "MCA represented during all negotiations that it intended to charge GWA an 8% commission, when MCA had no intention to charge that commission." (Id.). Namely, "On June 8, 2014, MCA, through Blaire Fanning, represented that MCA had only charged an 8% commission, when

MCA had, in fact, charged more than five times that amount in commission." (Id.). GWA asserts that these allegations were false and that MCA had no intention or ability to perform as promised. (Id. at 22). GWA further submits that MCA intended to induce reliance by GWA and that GWA did, in fact, rely on these false statements by initiating the Program with MCA and continuing with the Program after the June 18, 2014, meeting. (Id.).

Finally, GWA contends that it suffered damages as a result of its reliance on these representations. (Id.). To the extent MCA argues that GWA's damages claim in Count IV is "vague and duplicates the damages recoverable under Count I" (Doc. # 31 at 12), this Court finds that the facts alleged in GWA's fraud claim are separate and distinct from the facts stated in the breach of contract claim. The fraud claim is premised on the allegedly false statements that induced GWA to enter into and continue the contract, while the breach of contract claim is based on the alleged failure to comply with terms of the contract. Accordingly, MCA's Motion to dismiss Count IV is denied.

### D. Count V - Conversion

"Conversion is an unauthorized act which deprives another of his property permanently or for an indefinite

time." <u>In re United States Sugar Corp. Litig.</u>, 669 F. Supp. 2d 1301, 1329 (S.D. Fla. 2009). According to MCA, GWA's conversion claim should be dismissed as GWA fails to allege or attach to the Amended Counterclaim "written proof that GWA made any demand on MCA for the return of the money in this case." (Doc. # 31 at 13). Furthermore, MCA suggests that the Amended Counterclaim is devoid of any allegation that MCA refused to return the money GWA claims MCA converted. (<u>Id.</u>).

Moreover, MCA argues that GWA's claim for conversion fails on other legal grounds. (<u>Id.</u> at 13). Specifically, according to MCA:

> A breach of contract to pay money generally does not constitute conversion under Florida law. Where there are no compensatory damages stemming from a conversion apart from the compensatory damages claimed for breach of contract, the claim does not stand as a matter of law. The act of conversion must go beyond, and be independent from, a failure to comply with the terms of the contract.

(<u>Id.</u>)(internal citations omitted). Here, MCA posits that this dispute arises over money that GWA feels it is owed. (<u>Id.</u> at 13). Namely, MCA argues that:

> [i]n GWA's claim for breach of contract under Count I, GWA alleges that "MCA has breached the agreement with GWA by misusing funds paid by GWA for procurement of specified radio spots, and by converting substantial portions of those funds, at least $508,131.47, for its own use and benefit." In

> GWA's claim of conversion, GWA claims that MCA did
> not use the monies received from GWA to procure
> radio spots in accordance with the Program, but
> that GWA believes MCA wrongfully retained and
> converted $508,131.47 for its own use and
> enjoyment.

(Id. at 13-14). Therefore, MCA argues that "GWA's claim of conversion is prohibited by law since the alleged act of conversion in this case does not go beyond, and is not independent from, the alleged failure to comply with the terms of the contract." (Id. at 14).

However, as correctly argued by GWA, numerous Florida courts have found that demand for return of money is not necessary for a conversion claim. (Doc. # 37 at 10)(citing In re United States, 669 F. Supp. 2d at 1301 ("While demand by the rightful owner serves as actual notice of the rights of the bereaved party to the recipient, demand and refusal are not required elements for a conversion claim.")).

Moreover, GWA argues that the demand was not necessary as GWA alleged all of the required elements of conversion. (Id.). This Court agrees. See Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. 2d DCA 1963)("The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."); Senfeld v. Bank of Nova Scotia Trust

Co. (Cayman) Ltd._, 450 So. 2d 1157, 1161 (Fla. 3d DCA 1984)("[W]hile a demand and refusal constitute evidence that a conversion has occurred, it is unnecessary to prove a demand and refusal where the conversion can be otherwise shown."). Here, GWA alleged that it paid $1,364,895.49 to MCA to purchase radio advertising spots for GWA's radio advertising program. (Doc. # 29 at 23). However, instead of applying all of those funds to the radio advertising program, MCA allegedly retained at least $508,131.47 for its own use and benefit. (Id.). Therefore, upon review, and taking the allegations contained in the Amended Counterclaim in the light most favorable to GWA, the Court finds that GWA has sufficiently alleged its conversion claim to withstand MCA's Motion to Dismiss.

Moreover, "[t]o establish conversion when there is a contractual relationship, the conversion 'must go beyond, and be independent from, a failure to comply with the terms of a contract." (See Doc. # 37 at 12)(citing Lesti v. Wells Fargo Bank, N.A._, 960 F. Supp. 2d 1311, 1326 (M.D. Fla. 2013)). Here, GWA has sufficiently established, for purposes of the Court's present analysis, that the alleged conversion goes beyond the terms of the contract: "[n]ot only did MCA fail to perform as required under the contract, MCA retained funds

for its own use and benefit." (Id.). Thus, dismissal of Count
V is not warranted.

### E. Count VI – Breach of Fiduciary Duty

MCA argues that GWA's claim for breach of fiduciary duty
fails to state a valid cause of action and fails as a matter
of law "because MCA did not establish a fiduciary relationship
with GWA." (Doc. # 31 at 15). "The elements of a breach of
fiduciary duty claim are: (1) the existence of a fiduciary
duty, (2) the breach of that duty, and (3) damage proximately
caused by that breach." Border Collie Rescue, Inc. v. Ryan,
418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006).

"To establish a fiduciary relationship, a party must
allege some degree of dependency on one side and some degree
of undertaking on the other side to advise, counsel, and
protect the weaker party." Taylor Woodrow Homes Fla., Inc. v.
4/46-A Corp., 850 So. 2d 536, 540 (Fla. 5th DCA 2003). A
fiduciary relationship may be either express or implied.
Maxwell v. First United Bank, 782 So. 2d 931, 933 (Fla. 4th
DCA 2001). However "[i]n an arms-length transaction . . . ,
there is no duty imposed on either party to act for the
benefit or protection of the other party, or to disclose facts
that the other party could, by its own diligence have

discovered." <u>Watkins v. NCNB Nat. Bank of Fla., N.A.</u>, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993).

MCA suggests that GWA has failed to adequately establish that a fiduciary duty existed between GWA and MCA, thus, entitling GWA to the relief it seeks. (Doc. # 31 at 15). Namely, GWA has failed to "allege any degree of dependency on one side or any degree of undertaking on the other side to advise, counsel, and protect the weaker party" – here, MCA. (<u>Id.</u> at 16). As such, MCA posits that GWA cannot state a valid claim for fiduciary duty in this case, and Count VI should therefore be dismissed with prejudice. (<u>Id.</u>).

According to GWA, MCA's argument "focuses on implied fiduciary relationships, when GWA claims that it had an express fiduciary relationship, created by the principal agency relationship." (Doc. # 37 at 13; <u>see</u> Doc. # 29 at 24). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principals' behalf and subject to the principal's control, and agent manifests assert or otherwise consents so to act." (<u>Id.</u> at 14)(citing <u>F.D.I.C. v. Floridian Title Grp., Inc.</u>, 972 F. Supp. 2d 1289 (S.D. Fla. 2013)).

Even if the parties were not in an express fiduciary relationship, GWA submits that a fiduciary relationship could be implied. (Id.). "A fiduciary relationship may be implied by law and exists between two persons when 'one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation.'" (Id.)(citing Action Nissan, Inc. v. Hyundai Motor Am., 617 F. Supp. 2d 1177, 1192 (M.D. Fla. 2008)). GWA contends that it relied on MCA to act on its behalf and in its interests for the purposes of the radio advertising program; specifically, GWA relied upon MCA's recommendations for appropriate radio station formats for the advertising spots. (Doc. # 29 at 13).

Upon review, this Court finds that GWA has sufficiently alleged its claim for breach of fiduciary duty to sustain MCA's Motion under the liberal pleading requirements of Rule 8(a). GWA argues that it placed MCA in a position of trust and confidence, MCA accepted that position and promised to act in GWA's best interests, and that MCA failed to do so. (See Doc. # 29 at 23-24). The determination of whether a fiduciary duty did in fact exist, and whether it was based on an implied relationship or express relationship created by principal agency relationship, is better suited for the summary judgment stage of the proceedings. See Eslava v. Gulf

Tel. Co., 418 F. Supp. 2d 1314, 1322-23 (S.D. Ala. 2006)("The Court is of the opinion that the question of whether [Defendant] functioned in a fiduciary capacity is a fact intensive inquiry.")(citing In re Sprint Corp. ERISA Litig., 388 F. Supp. 2d 1207, 1227 (D. Kan. 2004) (finding that it is premature to determine scope of fiduciary duties and whether particular defendant acted in fiduciary capacity on motion to dismiss)). Thus, MCA's Motion to dismiss Count VI is denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Plaintiff My Classified Ads, L.L.C.'s Motion to Dismiss Counts II – VI of Defendant's Amended Counterclaim (Doc. # 31) is **DENIED.**

(2)   Plaintiff My Classified Ads, L.L.C. has until **March 27, 2015**, to file its Answer to Defendant's Amended Counterclaim.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 13th day of March, 2015.

_VIRGINIA M. HERNANDEZ COVINGTON_
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record

23